**Nos. 23-2074, 23-2075, 23-2191, 23-2192, 23-2193, 23-2194, 23-2239, 23-2252, 23-2253, 23-2255**

# In the United States Court of Appeals for the Federal Circuit

CYTIVA BIOPROCESS R&D AB,
APPELLANT

*v.*

JSR CORP., JSR LIFE SCIENCES, LLC.,
CROSS-APPELLANTS

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2022-00036, IPR2022-00041, IPR2022-00042, IPR2022-00043, IPR2022-00044, IPR2022-00045.

**RESPONSE AND REPLY BRIEF OF APPELLANT CYTIVA BIOPROCESS R&D AB**

DAVID M. KRINSKY
ANDREW L. HOFFMAN
WILLIAMS & CONNOLLY LLP
*680 Maine Ave., S.W.*
*Washington, DC 20024*
*(202) 434-5000*

# TABLE OF CONTENTS


INTRODUCTION....................................................................................1

ARGUMENT .......................................................................................3

I. The Board Erred in Failing to Perform a Lead Compound Analysis..........................................................................................3

A. A Lead Compound Analysis Was Necessary In This Case. ..........5

1. Demonstrating That a Chemical Modification Would Have Been Obvious Ordinarily Requires Demonstrating That the Compound To Be Modified Was a Lead Compound. ........................................................5

2. The Board Erred by Failing To Consider the Prior Art's Focus on Domain Z. ......................................................9

3. KSR's Obvious-to-Try Rationale is Inapplicable. ...............13

B. JSR Failed to Present Arguments and Evidence That the POSA Would Have Selected Domain C as a Lead Compound ..........................................................................18

II. The Board Erred in Ruling That the Dependent Fab Binding Claims (Claims 4 and 17 of the '765 Patent) are Unpatentable. ............24

A. The Board Cannot Rely on Inherency to Avoid Consideration of Whether the POSA Would Have Had a Reasonable Expectation of Success. ..............................................27

1. JSR's proposed blanket rule disregards precedent. ..........27

2. Cytiva's approach is consistent with precedent and underlying policy concerns. ..................................................32

B. The Board Cannot Rely on Inherency to Avoid Consideration of Objective Indicia of Nonobviousness. ...............37

1. Like all objective indicia of nonobviousness, inherent, unexpected results must be considered. ....37

2. The Board's failure even to consider the unexpected Fab-binding of the claimed C(G29A) ligands cannot be excused by JSR's arguments regarding the strength of that objective indicium. ....42

STATEMENT OF THE ISSUES ON CROSS-APPEAL ....44

SUMMARY OF ARGUMENT ON CROSS-APPEAL ....44

STANDARD OF REVIEW ON CROSS-APPEAL ....46

ARGUMENT ON CROSS-APPEAL ....46

III. The Board's Confirmation of the Cross-Appeal Claims Was Supported by Substantial Evidence and Should Be Affirmed. ....46

A. The Board's Decision Did Not Depend on Misconstruing "Binds to the Fab Part of an Antibody." ....49

1. The Board Properly Rejected JSR's Obviousness Arguments. ....49

2. JSR's New Argument that Fab Binding Inherently Would Occur During Whole-Antibody Purification Is Unsupported by the Record. ....53

B. JSR's "Combination Ligand" Argument Does Not Provide a Basis for Vacatur or Reversal ....57

C. The Board's Decision on Reasonable Expectation Was Supported by Substantial Evidence. ....62

CONCLUSION ....67

## TABLE OF AUTHORITIES

## CASES

*Abbott Lab'ys v. Sandoz, Inc.*, 544 F.3d 1341 (Fed. Cir. 2008) .......... 8

*Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293 (Fed. Cir. 2015) .......... 26, 38

*Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999 (Fed. Cir. 2009) .......... 20

*Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355 (Fed. Cir. 2016) .......... 19

*Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342 (Fed. Cir. 1999) .......... 32

*Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264 (Fed. Cir. 1991) .......... 56

*Corning v. Fast Felt Corp.*, 873 F.3d 896 (Fed. Cir. 2017) .......... 58

*Eisai Co. Ltd. v. Dr. Reddy's Lab'ys, Ltd.*, 533 F.3d 1353 (Fed. Cir. 2008) .......... 6, 8

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354 (Fed. Cir. 2018) .......... 67

*Ex parte Joseph P. Balint, Frank R. Jones, &Richard B. Gayle III*, No. 2022-000215, 2022 WL 179096 (P.T.A.B. Jan. 18, 2022) .......... 39

*Honeywell Int'l Inc. v. Mexichem Amanco Holdings S.A.*, 865 F.3d 1348 (Fed. Cir. 2017) .......... passim

*Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322 (Fed. Cir. 2020) .......... 36

*Impax Laboratories Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372 (Fed. Cir. 2018) .......... 12

*In re Couvaras*, 70 F.4th 1374 (Fed. Cir. 2023) .......... passim

*In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063 (Fed. Cir. 2012) .......... 42

*In re Google Tech. Holdings, LLC*, 980 F.3d 858 (Fed. Cir. 2020) ..................54

*In re Kotzab*, 217 F.3d 1365 (Fed. Cir. 2000).......................................................7

*In re NuVasive, Inc.*, 842 F.3d 1376 (Fed. Cir. 2016)........................................67

*In re Pearson*, 494 F.2d 1399 (C.C.P.A. 1974).............................................33, 34

*In re Rinehart*, 531 F.2d 1048 (C.C.P.A. 1976) ....................................27, 30, 31

*In re Spormann*, 363 F.2d 444 (C.C.P.A. 1966) ....................................27, 29, 30

*In re Wiseman*, 596 F.2d 1019 (C.C.P.A. 1979)................................................39

*Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052 (Fed. Cir. 2005).......56

*Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381
(Fed Cir. 2004) ..................................................................................38, 40, 42

*Koninklijke Philips NV v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020)........54

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)....................................passim

*Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356
(Fed. Cir. 2017) ......................................................................................37, 42

*Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371 (Fed. Cir. 2023)................................4

*Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316 (Fed. Cir. 2017)..........62

*Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd.*, 923 F.3d
1051 (Fed. Cir. 2019) ..........................................................................................7

*Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265 (Fed. Cir. 2018) .............47

*Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280 (Fed. Cir. 2012).......passim

*Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186
(Fed. Cir. 2014) ......................................................................................25, 32

*Pernix Ireland Pain DAC v. Alvogen Malta Ops. Ltd.*, 323 F. Supp. 3d
566 (D. Del. 2018)..............................................................................................28

*Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019) ....................passim

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007)....................16, 21

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989 (Fed. Cir. 2009) ....................5, 9

*Purdue Pharma Prod. L.P. v. Par Pharm., Inc.*, 377 F. App'x 978 (Fed. Cir. 2010) ....................20

*Sun Pharm. Indus., Inc. v. Incyte Corp.*, No. 19-2011, 2023 WL 5370639 (Fed. Cir. Aug. 22, 2023) ....................5

*Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309 (Fed. Cir. 2016) ....................62

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350 (Fed. Cir. 2007) ....................6

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155 (Fed. Cir. 2021) ....................46

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272 (Fed. Cir. 2017) ....................21

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317 (Fed. Cir. 2016)....................8, 23, 42

## STATUTES

35 U.S.C. § 102(a)....................23, 24

35 U.S.C. § 102(b)....................23, 24

35 U.S.C. § 311(a)....................54

## INTRODUCTION

JSR's brief reiterates the two critical legal errors that it previously led the Board into making. First, JSR and the Board simply skipped a lead compound analysis. The Board began its obviousness analysis of all claims with JSR's art, which referred to the five naturally occurring *Staphylococcus* Protein A ("SPA") domains (A, B, C, D, and E). It never inquired whether the person of ordinary skill in the art ("POSA") would have started in the same place. JSR straw-mans Cytiva's assertion of error as advocating a "rigid, mandatory rule," but no such rule was necessary to recognize—as precedent requires—that part of establishing that a modified Domain C would have been obvious was establishing that the POSA would have set out to modify Domain C in the first place. The obviousness analysis set forth in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), for situations where the art suggests a finite number of predictable solutions, is inapplicable here—the potential solutions are neither finite nor predictable—and the Board erred in applying it. And JSR's efforts to backfill reasons why Domain C would have been a lead compound are both improper on appeal and unsupported by the record.

Second, as to claims 4 and 17 of the ’765 patent, the Board independently erred in finding inherent obviousness. This Court repeatedly has held that for a claim to be obvious, the POSA must have a reasonable expectation of success in practicing the claimed invention. This Court also has repeatedly held that where a compound possesses unexpected properties—such as the capability of binding to the Fab part of an antibody recited in claims 4 and 17—the POSA would not have a reasonable expectation of success, even where the properties are inherent. *Honeywell Int’l Inc. v. Mexichem Amanco Holdings S.A.*, 865 F.3d 1348, 1355 (Fed. Cir. 2017). Contrary to JSR’s arguments, this case is not controlled by precedents holding that an inherent, unknown property of a known composition cannot impart patentable weight—which under JSR’s reading cannot be reconciled with *Honeywell*. Those cases do not apply where the inherent properties would have been surprising or where the claims represent a narrowing of a broader class of compounds held to be equally obvious, not all of which possess the property in question.

Despite these errors, the Board reached the correct result on the claims at issue in the cross-appeal, as will be detailed below. On those claims, there is no legal issue of substance. Substantial evidence supports the

Board's findings that binding to the Fab portion of an antibody would not have been obvious and that JSR failed to prove that the process claims would be practiced inherently.

## ARGUMENT

### I. The Board Erred in Failing to Perform a Lead Compound Analysis

The Board's obviousness analysis of all claims held unpatentable was built upon the wrong legal framework. Because all challenged claims concern new chemical compounds derived from prior art compounds, the Board should have begun its analysis by determining whether the POSA "would have selected the asserted prior art compounds as lead compounds, or starting points, for further development efforts." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1291 (Fed. Cir. 2012). The Board skipped this crucial step. Instead, building on prior art that referred generally to all five naturally occurring SPA binding domains and taught replacing the glycine at position 29 with an alanine (a "G29A" substitution), it reasoned that the five domains, modified with that substitution, represent a finite number of predictable solutions under *KSR*. Appx35-37; Appx90-93; Appx152-54; Appx211-13; Appx266-69; Appx328-30; *see* Appx1098 (rejecting lead compound framework). This reasoning ignores the many other options

available to the POSA operating in the highly unpredictable field of protein engineering, and fails to address which of those options the POSA would have pursued. The Board thus erred by relying on *KSR* to leapfrog the necessary lead compound analysis.

That error cannot be cured by JSR's *ex post* reasoning that the POSA would have selected Domain C as a lead compound. For starters, in its Petitions to the Board, JSR did not argue that the POSA would have been motivated to select Domain C as a lead compound and therefore cannot do so now. *See Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371, 1377 (Fed. Cir. 2023). JSR's arguments on the merits are anyway wrong, and the Board's factual findings—none of which related to selecting Domain C as a lead compound—cannot save its decisions. JSR argues that the prior art had already winnowed the universe of starting points to the five natural SPA domains. That assertion is belied by JSR's own art. The prior art was uniformly focused on (man-made) Domain Z, which differs from Domain C at multiple amino acid positions. Isolated references to the five natural SPA domains, plucked from a sea of art exploring other directions, fail to supply the requisite teaching to select Domain C as a lead compound.

## A. A Lead Compound Analysis Was Necessary In This Case.

### 1. *Demonstrating That a Chemical Modification Would Have Been Obvious Ordinarily Requires Demonstrating That the Compound To Be Modified Was a Lead Compound.*

The Board failed to assess whether the POSA would have selected Domain C as a lead compound. Such analysis typically is necessary where, as here, an obviousness challenge involves modifying known chemical compounds, even those with structural homology. As this Court has said: "An obviousness argument based on structural similarity between claimed and prior art compounds 'clearly depends on a *preliminary finding* that one of ordinary skill in the art would have selected [the prior art compound] as a lead compound.'" *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (alteration in original) (emphasis added). Elsewhere, this Court has said, in no uncertain terms, that "[f]or new chemical compounds, we apply a two-step test for determining obviousness"—the first step requiring the court to determine "whether a chemist of ordinary skill would have selected the asserted prior art compounds as lead compounds, or starting points, for further development efforts." *Sun Pharm. Indus., Inc. v. Incyte Corp.*, No. 19-2011, 2023 WL 5370639, at *4 (Fed. Cir. Aug. 22, 2023) (quoting *Otsuka*, 678 F.3d at 1291).

This standard serves as a proven safeguard against hindsight—an enduring concern of the obviousness inquiry. *See KSR*, 550 U.S. at 421. Permitting a challenger to point to "mere structural similarity" (or homology) "between a prior art compound and the claimed compound" "impermissibly" permits "*ex post* reasoning." *Otsuka*, 678 F.3d at 1292. Thus, even "post-*KSR*, a prima facie case of obviousness for a chemical compound still, in general, begins with the reasoned identification of a lead compound." *Eisai Co. Ltd. v. Dr. Reddy's Lab'ys, Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008).

JSR constructs and attacks a straw man in arguing that the lead compound framework cannot apply *universally* to obviousness challenges involving the chemical arts. *See* JSR Br. ("JB") 27, 29. True, the lead compound approach will usually best fit the scientific realities of the chemical arts, and "is consistent with the legal principles enunciated in *KSR*." *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356 (Fed. Cir. 2007). But Cytiva has not advocated a universal rule based on the scientific field. Rather, the lead compound analysis is necessary here because—despite JSR's efforts to distinguish this case on its facts, JB 27—its obviousness arguments turned on making a particular modification to a particular chemical compound that JSR selected from multiple options in the

art: Domain C. In such circumstances, this Court has held, "it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound." *Id.* at 1356-57 (citations omitted).

Contrary to JSR's suggestion, this Court's decision in *Novartis Pharmaceuticals Corp. v. West-Ward Pharmaceuticals International Ltd.*, 923 F.3d 1051, 1060 (Fed. Cir. 2019), does not limit this analysis to claims that are directed to a compound rather than to an apparatus or method incorporating it. JB 29. *Novartis* did not involve analyzing the obviousness of modifications to a compound at all; it involved methods of administration of an already-known compound, everolimus, to treat a particular cancer. *Id.* at 1054-55.

In fact, the legal principles underlying the need for a lead compound analysis are not limited to the chemical arts, let alone to one particular type of claim. Every obviousness analysis requires "casting the mind back to the time of invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the *then-accepted* wisdom in the field." *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000) (emphasis added). That is, to properly consider the field's "state of advance, the nature of the

known choices, the specificity or generality of the prior art, and the predictability of results," all required aspects of the obviousness analysis, *Abbott Lab'ys v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008), a tribunal must consider the prior art as a whole and the choices the POSA actually would have made, not simply focus out of context on the references selected by a challenger. "Too often the obviousness analysis is framed as an inquiry into whether a person of skill, with two (and only two) references sitting on the table in front of him, would have been motivated to combine … the references in a way that renders the claimed invention obvious." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016). "The real question is whether that skilled artisan would have plucked one reference out of the sea of prior art … and combined it with conventional … elements to address some need present in the field … ." *Id.*

What distinguishes the chemical arts is that "'identified, predictable solutions' may present a difficult hurdle because potential solutions are less likely to be genuinely predictable." *Eisai*, 533 F.3d at 1359. *KSR* "did not create a presumption that all experimentation in fields where there is already a background of useful knowledge is 'obvious to try,' without considering the nature of the science or technology." *Abbott Lab'ys*, 544 F.3d

at 1352. Nor did it limit the need to consider that technology, or how the POSA would have approached it, when evaluating whether the POSA would have been motivated to follow the path a challenger suggests. *Procter & Gamble*, 566 F.3d at 994.

#### 2. ***The Board Erred by Failing To Consider the Prior Art's Focus on Domain Z.***

Without analysis, the Board simply started where JSR told it to, analyzing only whether it would have been obvious to modify the five naturally occurring domains without addressing how the POSA would have approached the problem of designing an improved SPA-based ligand. *See, e.g.*, Appx33-35; Appx88-91; Appx149-52. At institution, the Board outright rejected the lead-compound analysis, Appx1098, a legal determination it never revisited despite Cytiva's urging.

The Board's failure even to consider whether the POSA would have had reason to modify Domain C so as to arrive at the claimed C(G29A) ligand was legal error because the undisputed record shows that the POSA would *not* have started with Domain C. JSR's expert, Dr. Cramer, was unable to find a single prior art reference singling out Domain C for further development. *See* Appx6309-10; Appx7592-93. And while all five domains had known affinities for Fc and certain Fab fragments, the art had moved on

from modifying the natural domains to create improved chromatography ligands. Nearly all activity in designing SPA-based ligands involved modifying Domain Z. *See* Cytiva Br. 28-29 & n.4 (collecting references dedicated to improving the characteristics of Domain Z and related Domain B). That domain was known to possess superior alkaline stability while maintaining binding capacity for IgG. *See* Appx3816. The art heralded the success of Domain Z-based ligands and focused on improving the properties of such ligands. *See, e.g.*, Appx4985; Appx4988.

JSR observes that Domain Z was derived from the natural Domain B, which shares similarities with the other four natural SPA domains. JB 31-32. JSR also notes that the five natural domains were known to have affinity for Fc and certain Fab fragments and had been employed in commercial affinity ligands. JB 32. These arguments, however, are at best belated attempts to justify a different starting point and deviate from the prior art's focus on Domain Z, not reasons why the Board (or JSR's Petitions) could gloss over the lead-compound question.

Despite the field's uniform focus on improving characteristics of Domain Z (and related Domain B) and the fact that no one was working with Domain C, JSR singles out two references, Abrahmsén and Hober, as

allegedly pointing to the claimed G29A modification made to Domain C. JB 25. In fact, those teachings are at most general ones, with no focus on Domain C in preference to other domains as a lead compound—and the Board did not find otherwise. Rather, Abrahmsén states, just once, that the G29A modification can be made to "any of the E D A B C domains." Appx3833. The context, moreover, is applying the G29A mutation to Domain B to create the synthetic Domain Z. Appx3833-38. Dr. Cramer conceded this point. *See, e.g.*, Appx7603 (Dr. Cramer agreeing that Abrahmsén's work concerns Domain Z); *see also* Appx34 (Board finding that Abrahmsén "only exemplifies the cloning and expression of the Z-domain").

For its part, Hober never even references G29A in connection with Domain C, contrary to JSR's characterization. Hober's text is plain: "[I]n an embodiment advantageous for structural stability reasons, the glycine residue in position 29 of *SEQ ID NO[]. 1* has also been mutated, preferably to an alanine residue." Appx3851 (emphasis added). Hober explicitly defines SEQ ID NO. 1 as "the amino acid sequence of the *B-domain* of SPA." Appx3848 (emphasis added). The Board made no contrary findings.

Contrary to JSR's assertions, Cytiva's observation that neither of these references would have given the POSA reason to start with and modify

Domain C is not an attempt to limit the references to preferred embodiments. JB 35-36; *see* Appx34. Rather, Cytiva's point is that JSR was obligated to demonstrate that the POSA would have had reason to modify Domain C. The references' passing mention of that domain does not provide such a reason, yet JSR presented no other evidence to support its reliance on Domain C in preference to the art as a whole, which focuses elsewhere and discloses the availability of numerous potential lead compounds.

In that regard, this case is analogous to *Impax Laboratories Inc. v. Lannett Holdings Inc.*, 893 F.3d 1372 (Fed. Cir. 2018). There, this Court rejected a patent challenger's reliance on teachings in the prior art "expressly disclos[ing] nasal formulations of zolmitriptan" (a selective serotonin receptor agonist) as claimed in the challenged patents, and observed that the asserted prior art, "as a whole, is not about intranasal formulations of zolmitriptan," which was "mentioned once, with no further mention in an example or claim." *Id.* at 1379. The reference to zolmitriptan needed to be "properly considered" against "additional record evidence to make findings on the state of the prior art as a whole." *See id.* at 1380.

In sum, none of the Board's findings, and none of JSR's arguments, suggest that the Board actually applied an *Otsuka*-style lead-compound analysis. That was legal error.

### 3. *KSR*'s Obvious-to-Try Rationale is Inapplicable.

JSR does not dispute the value of the lead compound test in new chemical compound cases. In fact, JSR concedes that "[w]hen a compound's alleged obviousness is based on optimization of prior-art compounds," the lead compound test is triggered. JB 27. This is an ironic and devastating admission, given that the obviousness case here is based on exactly that—the supposedly obvious optimization of Domains A, B, C, D, and E with a G29A mutation. But JSR claims this case is different in kind. According to JSR, because the prior art (specifically Abrahmsén and Hober) suggested modifying Domain C, among other domains, with a G29A mutation and provided a justification for that modification, no further justification for Domain C as a starting point was required. JB 18, 26, 31. Alternatively, JSR posits that the POSA "would as a matter of ordinary skill attempt importing a successful modification from one domain of a protein to one of just four other homologous domains of the same protein." JB 30. Each of these

formulations turns on *KSR*'s "obvious-to-try" rationale. *See KSR*, 550 U.S. at 421.

The problem for JSR is that the *KSR* framework—limited by its terms to situations where there are a "finite number of identified, predictable solutions," *id.*—is inapplicable here, as in many chemical cases. The prior art teaches that (1) the number of starting points available to the POSA would have been anything but "finite" and (2) the field of protein engineering is highly unpredictable.

**a. Number of Solutions**

JSR admits that "the universe of potential modified SPA ligands that could theoretically be used in chromatography for any purpose was large." JB 31. JSR dismisses this undisputed fact, committing the same mistake the Board made in arguing that "the prior art itself already provided a marker narrowing the selection to 'any of' the five natural SPA domains.'" JB 31. That sort of argument does nothing to address concerns of hindsight reasoning and demonstrates the necessity of the lead compound analysis here. JSR (and Dr. Cramer) have admitted that Domains A, B, C, D, and E were not the only possible starting points for creation of a ligand for isolating IgG. JB 31; Appx2974-75; Appx6268. And as discussed, the field of SPA-

based ligand design was focused on Domain Z—a different and more likely starting point than the natural SPA domains. *See* Cytiva Br. 28-29 & n.4. In addition, G29A was far from the only modification the POSA would have considered. JSR's own prior art references teach other improved ligands, many of which are improvements over Domain Z and not Domains A, B, C, D or E, which themselves could have been starting points for further work, and involved mutations beyond G29A. *E.g.*, Appx3820 (Z(N23T)); Appx3877 ("Z(N23T/N3A/N6D)dimer-Cys and Z(N23T/N3A)dimer-Cys"); Appx6268. Other potential solutions to designing an SPA-based ligand abounded in the prior art. *See* Appx7321 (Dr. Bracewell identifying additional potential solutions to designing an SPA-based ligand based on teachings in Linhult and Hober). Thus, the undisputed record demonstrates that the POSA, confronted with the problem of designing an improved SPA-based ligand, would consider more than just the five natural SPA domains. There is no basis in the record to support treating Domains A through E as the POSA's finite universe of starting points.

**b. Predictability**

JSR does not seriously dispute that the field of protein engineering was unpredictable. Nor could it, since Dr. Cramer conceded the

unpredictability of even single-amino-acid changes on a protein ligand's properties. *See, e.g.*, Appx6261; Appx6266; Appx7263-64. That unpredictability, moreover, was a finding underlying the Board's (correct) holding that certain method claims had not been shown unpatentable. *See infra* Section III (discussing cross-appeal).

JSR instead argues that "obviousness cannot be avoided simply by showing of some degree of unpredictability in the art[.]" JB 32 (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007)). That aphorism misstates the record and misses the point. The record evidence does not show "some degree of unpredictability"; it establishes that the field of protein engineering is "probably one of the most unpredictable areas of biotechnology." Appx4326; *see* Appx6260-61; Appx6266; Appx7263-64. And Cytiva is not arguing that the unpredictability warrants an obviousness determination without more. The relevance, rather, is that *KSR*'s rubric for evaluating the obviousness of a few straightforward choices—having *predictable* application—is inapposite, meaning that JSR and the Board were obligated under *Otsuka* to justify why the POSA would have selected a starting point and made modifications leading to the claimed invention.

JSR relies heavily on a single finding made by the Board in support of predictability, which was based on a computer simulation showing that a G29A mutation in any one of the five naturally occurring protein A domains would not impact IgG binding. JB 32 (citing Appx38-39). JSR does not dispute that this singular finding says nothing about whether the POSA could predict other properties of an SPA-based ligand with a G29A mutation, and the Board did not find that it did. According to JSR, however, such findings are untethered from the claim limitations and thus unnecessary. JSR. Br. at 32-33. Not so. For example, the independent claims of the '142 and '007 patents claim a process "for isolating one or more target compounds, the process comprising" not just "adsorbing the target compound," but first coupling the ligand "comprising at least two polypeptides" to a solid support and then "eluting the compound," among other things. Appx391; Appx404. Those limitations directly relate to a protein's oligomerization properties (*i.e.*, chemical interactions between polypeptides) and to achieving sufficient affinity for target compounds while also permitting elution (*i.e.*, release of the ligand-bound target compounds). *See* Appx7267. The Board made no findings with respect to these properties, and the record evidence—including testimony from JSR's own expert—

establishes that the POSA could not predict the impact of even single amino acid changes on these properties. *See* Appx7267-68; Appx7307-08 (citing Appx6308-09).

The other factual findings the Board made underscore the unpredictability of the art. For example, the Board found that the art taught the unpredictability of Fab binding to mutated SPA domains. *See, e.g.*, Appx164. Indeed, to the extent the POSA could predict anything about the Fab binding properties of an SPA-based ligand with a G29A mutation, the POSA would have predicted that such a ligand would lack the ability to bind Fab fragments, underscoring the inapplicability of *KSR*'s "obvious-to-try" test. Appx164 (Board finding that the Jansson reference "shows that the G29A mutation results in a loss of Fab binding ability").

### B. JSR Failed to Present Arguments and Evidence That the POSA Would Have Selected Domain C as a Lead Compound

1. Nowhere in its Petitions did JSR attempt to explain why the POSA would have selected Domain C as a lead compound, let alone address the lead compound analysis and cases like *Otsuka*. Given the resulting state of the record, "this is not a case where a more reasoned explanation than that provided by the Board can be gleaned from the record"; thus, because the

Board committed legal error, its decision must be reversed. *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1366 (Fed. Cir. 2016).

On appeal, JSR attempts to divine lead compound factual findings from the Board's decisions. JSR points to the Board's reference to the five natural SPA domains' affinities for Fc fragments and certain Fab fragments as well as Linhult's teaching of using the Z domain and Z domain mutants (which necessarily contain a G29A mutation) as sufficient evidence "to show a POSA's motivation to start with 'each' of the five SPA domains in creating a chromatography matrix for isolating IgG." JB 33-34 (citing Appx31-32; Appx33).

If anything, however, this evidence reinforces using Domain Z as the starting point and offers no reason for the POSA to single out Domains A, B, C, D, or E for further development. As the Board found, "Linhult exemplifies using the Z domain and Z domain mutants attached to [a] column for the isolation of IgG from a sample." Appx33. And Linhult identifies the Z(N23T) mutant (and not Domains A, B, C, D, or E) as "the most promising candidate as [sic] ligand in affinity purification of IgG." Appx3820. That all the identified domains had some affinity for IgG does not displace the prior art's uniform focus on Domains Z and related Domain B, along with certain Domain Z

mutants. Nor does the fact that Domain Z is derived from a natural SPA domain (Domain B) matter. *Contra* JB 34. Many chemical compounds are derived from earlier-discovered, known compounds and involve small structural changes. That alone does not justify ignoring progress in the art and treating all known precursor compounds as lead compounds. Winnowing the universe of potential starting points is the role of the lead compound analysis.

Of course, the prior art need not point to one single lead compound. *See* JB 35 (citing *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1008 (Fed. Cir. 2009); *Purdue Pharma Prod. L.P. v. Par Pharm., Inc.*, 377 F. App'x 978, 982 (Fed. Cir. 2010)). But a patent challenger bears the burden of showing that the prior art supplies the POSA a reason to select particular compounds as leads over other, available compounds. *Otsuka*, 678 F.3d at 1291-92. That analysis must be "guided by evidence of the compound's pertinent properties." *Id.* at 1292. JSR observes that each of the natural domains shows individual affinity for Fc and Fab fragments. JB 34. But JSR never compared the properties of potential starting points—including the Domain Z mutants praised in JSR's own cited references—to justify the selection of native Domain C as one of multiple lead compounds,

and thus failed to carry its evidentiary burden. *See Pfizer*, 480 F.3d at 1363 (comparing properties of pharmaceutically-acceptable anions to narrow broad genus to a select few).

2. JSR again extends itself beyond the scope of its Petitions in arguing that the prior art pointed to Domain C individually as a promising lead compound. JSR failed to raise this argument in its Petitions and cannot "cure the petition[s'] deficiencies in its subsequent briefing to the Board and to [this Court]." *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1286 (Fed. Cir. 2017). The Board also did not rely on the arguments JSR now propounds regarding the selection of Domain C as a lead compound. Regardless, JSR's arguments are unavailing.

First, JSR argues that Linhult considered Domain C, alongside the other four natural SPA domains, when considering potential mutations to Domain Z. From this, JSR suggests that the prior art pointed to Domain C as a lead compound. JB 36. But Linhult incorporated just one mutation from Domain C and never suggested that Domain C be adopted wholesale. To the contrary, Linhult expressly directs the POSA to a Domain Z mutant, which differs at multiple residues from Domain C, as the "most promising candidate as [a] ligand in affinity purification of IgG." Appx3820. That

Cytiva markets a chromatography matrix containing natural SPA—and thus necessarily Domain C along with the other natural domains—is irrelevant. *Contra* JB 37. The art had taught for decades the viability of SPA as a ligand for IgG purification. But the art also was moving on from using natural SPA and all five of its domains. Indeed, starting in 2004, Cytiva heavily marketed its MabSelect SuRe™ product, which includes a tetramer of the engineered Z domains. Appx3911-16. And nearly all, if not all, research at the time regarding engineered forms of SPA (including research sponsored by Cytiva) focused on Domains B and Z and not Domain C. *Supra* Section I.A.2.

Second, JSR argues from Fab-fragment binding data that the POSA would have selected Domain C as a lead compound. JB 37-38. JSR's argument is both ironic and misplaced. Elsewhere in its brief (at 32-33), JSR accuses Cytiva of focusing on unclaimed properties in assessing the unpredictability of protein engineering yet does just that in arguing that Domain C's Fab-binding characteristics make Domain C a credible lead compound. JSR attempts to pin the idea of Fab-fragment binding as a motivation on Cytiva. JB 37 (citing Cytiva Br. 41-42). But Cytiva presented the effects of a G29A mutation on Fab-binding to illustrate the unpredictability of the art and explain why the POSA would have *avoided* a

G29A mutation. And JSR's suggestion (at 38)—citing Cytiva's expert—that Fab binding would make Domain C a promising starting point makes no sense in conjunction with the G29A modification JSR then seeks to deploy, which would have been expected to destroy Fab binding. *E.g.*, Appx7285-86.

Third, JSR relies on the teachings of Berg—not relied upon by the Board—which mentions Domain C as one of two "preferabl[e]" ligands. Appx4166. But JSR fails to offer any reason why the POSA would have plucked Berg and its single reference to Domain C from the sea of prior art focused on Domains B and Z. *See WBIP*, 829 F.3d at 1337. JSR argues that Berg cannot be limited to its embodiments and must be considered for all it discloses. JB 38. But, as previously explained, prior art also must be considered as a whole and in the context of other art in the field. *See supra* at pp. 7-8. JSR cannot rely on hindsight without explanation to short-circuit this law.

In all events, Berg is not prior art under pre-AIA § 102(a), the provision on which JSR relied to argue its prior art status. On appeal, JSR does not contend that Berg qualifies as § 102(a) prior art, relying solely on § 102(b). JB 38-39. But nowhere in its Petitions did JSR contend that Berg qualifies as prior art under § 102(b). In fact, in its request to the Board to

institute multiple sets of petitions, JSR argued that Berg, "the primary reference in [the second set of petitions], was published on June 22, 2006, and is therefore prior art under 35 U.S.C. § 102(a)." *See, e.g.*, IPR2022-00045, Paper 4 at 2-3. JSR observed that Cytiva may attempt to swear behind Berg and accordingly prepared a first set of petitions "based upon primary references" that "are prior art under 35 U.S.C. § 102(b)." *See, e.g.*, IPR2022-00045, Paper 4 at 3. And JSR argued that "a dispute about priority date require[s] arguments under multiple prior art petitions." *See, e.g.*, IPR2022-00045, Paper 4 at 2. The Board agreed and instituted both sets of petitions. JSR cannot now about face and argue Berg qualifies as prior art under § 102(b).

But the Court need not and should not wade into this dispute. JSR did not argue in its Petitions that Berg establishes a motivation to select Domain C as a lead compound, and Berg is insufficient to establish such a motivation. This Court thus should reverse the Board's unpatentability decisions.

## II. The Board Erred in Ruling That the Dependent Fab Binding Claims (Claims 4 and 17 of the '765 Patent) are Unpatentable.

Separately, the Board also erred in its conclusion that claims 4 and 17 of the '765 would have been inherently obvious. Those claims require the

claimed ligands to be capable of Fab binding, a property the POSA would not have expected (as the Board agreed in analyzing the similar process claims).

This Court has warned against the unbridled extension of "inherency" arguments from the familiar context of anticipation challenges to the more nuanced arena of obviousness. *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014) ("[T]he use of inherency, a doctrine originally rooted in anticipation, must be carefully circumscribed in the context of obviousness."). It has explained that caution is needed at least in part "because [t]hat which may be inherent is not necessarily known and that which is unknown cannot be obvious." *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (internal quotation marks omitted). "What is important regarding properties that may be inherent, but unknown, is whether they are unexpected. All properties of a composition are inherent in that composition, *but unexpected properties may cause what may appear to be an obvious composition to be nonobvious*." *Id.* at 1355 (emphasis added). This Court thus held in *Honeywell* that it was legal error for the Board to "dismiss[] properties of the claimed invention as merely inherent, without further consideration as to unpredictability and unexpectedness." *Id.*

JSR, however, like the Board before it, chooses to ignore these warnings, advocating for a blanket rule that an unexpected, inherent property can *never* render a claim nonobvious. Decades of precedent paint a different picture. True, this Court has explained that in certain contexts simply claiming an inherent feature is insufficient to establish patentability. *See, e.g.*, *Persion Pharms. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184, 1190-91 (Fed. Cir. 2019). But in others, it has made clear that such features, particularly when they are unexpected, can preclude a finding that there would have been a reasonable expectation of success, and can provide an objective indicium of nonobviousness. *See, e.g.*, *Honeywell*, 865 F.3d at 1354-55; *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1307 (Fed. Cir. 2015). The surprising Fab-binding capability of C(G29A) ligands to which claims 4 and 17 of the '765 patent are directed fall in the latter camp. Cytiva has explained why that is so; JSR would prefer this Court simply pretend as if decades of precedent did not exist.

### A. The Board Cannot Rely on Inherency to Avoid Consideration of Whether the POSA Would Have Had a Reasonable Expectation of Success.

#### 1. *JSR's proposed blanket rule disregards precedent.*

JSR's absolutist position is clear—it asks the Court to announce a new, bright-line rule that the POSA need not have a reasonable expectation of success in achieving a claimed, inherent property. JB 40. It is equally clear that such a rule cannot be squared with this Court's and its predecessor's precedent. *See, e.g.*, *Honeywell*, 865 F.3d at 1354-55; *In re Rinehart*, 531 F.2d 1048, 1054 (C.C.P.A. 1976) ("The view that success would have been 'inherent' cannot, in this case, substitute for a showing of reasonable expectation of success. Inherency and obviousness are entirely different concepts."); *In re Spormann*, 363 F.2d 444, 448 (C.C.P.A. 1966) ("[T]he inherency of an advantage and its obviousness are entirely different questions.").

JSR's desired rule is inconsistent with the guidance this Court provided only a few years ago in *Honeywell*. As noted above, *Honeywell* vacated an IPR obviousness determination, finding that "the Board's analysis was legally erroneous in its consideration of inherency" and

explaining that "unexpected [inherent] properties may cause what may appear to be an obvious composition to be nonobvious." 865 F.3d at 1355-56.

JSR now attempts to distinguish *Honeywell* as a decision about only the role of inherency vis-à-vis the question of "motivation to combine." JB 47-48 (discussing *Pernix Ireland Pain DAC v. Alvogen Malta Ops. Ltd.*, 323 F. Supp. 3d 566, 607 (D. Del. 2018)). This Court's recent *In re Couvaras*, 70 F.4th 1374 (Fed. Cir. 2023) decision, however, refutes JSR's (and *Pernix*'s) reading. The *Couvaras* court did not read *Honeywell* nearly so narrowly. *Couvaras* concerned patent claims reciting "methods of increasing prostacyclin release in the systemic blood vessels of a human with essential hypertension to improve vasodilation." *Id.* at 1377. "That increased prostacyclin release is achieved by co-administering two well-known types of antihypertensive agents: a GABA-a agonist and an Angiotensin II Receptor Blocker ("ARB")," so "[i]n reality, the claims relate to combatting hypertension with known antihypertensive agents and claiming their previously unappreciated mechanism of action." *Id.* The patentee "[c]ontend[ed] that because the increased prostacyclin release was unexpected, under *Honeywell International Inc. v. Mexichem Amanco Holdings S.A.*, it cannot be dismissed as having no patentable weight due to

inherency." *Id.* at 1380. While this Court rejected that argument, the nature of its rejection was notable. If *Honeywell*'s inherency warnings were, as JSR suggests, limited to only those circumstances in which a challenger improperly sought to use an inherent feature to supply the necessary motivation to combine, *Couvaras* could have said just that. It did not. Rather, it emphasized instead the fact-specific nature of the inquiry and merely clarified that *Honeywell* did not establish a bright-line rule in the *other direction—i.e.*, that unexpected inherent properties will *always* render a claim nonobvious. This Court wrote: "*Honeywell* held that 'unexpected properties may cause what may appear to be an obvious composition to be nonobvious,' not that unexpected mechanisms of action must be found to make the known use of known compounds nonobvious." *Couvaras*, 70 F.4th at 1380 (quoting *Honeywell*, 865 F.3d at 1355 (emphasis added in *Couvaras*)).

JSR's efforts to distinguish Cytiva's other decisions likewise fail. *In re Spormann*, 363 F.2d 444 (C.C.P.A. 1966), for example, cautions that "the inherency of an advantage and its obviousness are entirely different questions." *Id.* at 448. "That which may be inherent is not necessarily known" and "[o]bviousness cannot be predicated on what is unknown." *Id.* JSR now attempts to cast this warning in the same vein as it misreads

*Honeywell*'s—as no more than a prohibition against using inherency to supply a missing motivation to combine. JB 48-49. Such a limited reading, however, finds no support in the text of *Spormann*, which does not even include the word "motivation." In fact, the very sentence of *Spormann* that JSR partially quotes in support of its narrow interpretation, JB 49, is most naturally understood to speak to both motivation *and* reasonable expectation of success, *see Spormann*, 363 F.2d at 447 ("The issue therefore is: would it be obvious to one of ordinary skill in this art to conduct the old reaction by such spraying under all the conditions set out in the claims *and obtain appellants' results*, i.e., would the invention as a whole have been obvious?" (emphasis added)).

JSR goes so far as to reimagine *In re Rinehart*, 531 F.2d 1048 (C.C.P.A. 1976), as "an inapposite motivation-to-combine case," and even has the temerity to criticize Cytiva for its purported failure to "analyz[e] the case as a whole." JB 49-50. But it is JSR that assiduously avoids (over two pages of discussion) the express warnings in *Rinehart* that the inherency of a claimed feature cannot absolve a challenger of its responsibility to demonstrate a reasonable expectation of success. As Cytiva previously explained, the claims at issue in *Rinehart* were directed to methods for the

commercial-scale production of polyesters. 531 F.2d at 1049. The *Rinehart* court found that "[t]he tribunals below did not meet the requirement of establishing some *predictability of success* in any attempt to combine elements of the refer[e]nce processes in a commercial scale operation." *Id.* at 1053-54 (emphasis added). It then explicitly cautioned that "[t]he view that success would have been 'inherent' cannot, in this case, *substitute for a showing of reasonable expectation of success*" and that "[i]nherency and obviousness are entirely different concepts." *Id.* at 1054 (emphasis added). That *Rinehart* may have found that the unexpected nature of the claimed methods' commercial-scale success *also* undermined the necessary motivation to combine does not somehow erase the decision's plain language regarding the intersection of inherency and reasonable expectation of success—language that JSR ignores.

JSR's bid to reframe every "reasonable-expectation-of-success case" as no more than a "motivation case" thus runs headlong into the actual text of those decisions and this Court's own interpretation of the same. Those precedents make clear that in at least some circumstances, the unexpected nature of inherent properties of an invention *can* defeat a reasonable expectation of success finding. Claims 4 and 17 of the '765 patent and the

surprising Fab-binding recited in those claims represent such a circumstance.

### 2. *Cytiva's approach is consistent with precedent and underlying policy concerns.*

The appropriate limits of inherency in an obviousness analysis can be best understood by reference to the anticipation context from which the doctrine originated. *Par Pharm.*, 773 F.3d at 1195. In an anticipation case, the claimed composition necessarily must have been present in the prior art, and, by definition, so must its inherent features. Claiming those features, even if they were previously unrecognized, provides the public no additional value and is not permitted. *See Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999).

The rationale for applying the inherency doctrine in an obviousness case, however, is far less certain—the claimed composition definitionally was *absent* from the prior art, as were its inherent features. This Court and its predecessor have therefore charted a middle path in the obviousness context, relying on inherency in some cases and warning against its use in others. The guiding principle differentiating one set of cases from the other is what value the claims deliver to the public. When the prior art points to the obviousness of the *specific* method or composition claimed, and a claim

simply recites an inherent property the method or composition happens to have, that property offers relatively little value—the POSA would be driven to perform the particular method or make the particular composition claimed and would thereby come to possess its inherent qualities. At the other extreme, when the challenger's obviousness theory points only generally towards a *class or category* of methods or compositions, of which the claimed method or composition is but one of many, the claim's identification of a surprising, inherent property of a particular method or composition can deliver tremendous value.

None of the authority cited by JSR is inconsistent with this principle. JSR (at 42), for example, relies upon *In re Pearson*, 494 F.2d 1399 (C.C.P.A. 1974) and its statement that claim terms that "merely set forth the intended use for, or a property inherent in, an otherwise old composition … do not differentiate the claimed composition from those known to the prior art." *Id.* at 1403. *Pearson*, however, was an *anticipation case*, not an obviousness one, *see id.* at 1402, a fact that that JSR carefully avoids despite Cytiva having pointed it out previously, Cytiva Br. 55. Again, it makes perfect sense to allow inherency to satisfy a missing claim limitation in an anticipation

analysis—if the claimed composition already exists in the prior art, so do its inherent properties.

In any event, even *Pearson* warns of the limits of inherency, explaining that it does "not mean to imply that terms which recite the intended use or a property of a composition can never be used to distinguish a new from an old composition." 494 F.2d at 1403. Downplaying these admonitions as dicta, JSR contends: "Cytiva does not 'define … some characteristic not found in the' obvious C(G29A) ligand—it does not describe some further modification or form of the composition not known in the art. The Fab-binding characteristic is inherent in the obvious combination, and thus lacks patentable weight." JB 43 (internal citation omitted). But in doing so, JSR unintentionally spotlights the distinction between, on one hand, the proper use of inherency in an anticipation case or an obviousness analysis where the prior art motivates the use of a particular claimed composition and, on the other hand, the improper use of inherency in those cases where an unexpected discovery gives a previously mundane composition new value, for example when a patentee newly spotlights only some compositions from within an allegedly obvious class or category. In the former case, the claimed composition is treated as an "old composition" either present in or directly

taught by the art. The claimed composition cannot be distinguished from that "old composition" by pointing out an inherent feature—such feature also would exist in the "old composition" described in or taught by the art. In the latter case, the "old composition" is not really a composition at all but a class or category of compositions, and the identification of the unexpected property distinguishes the compositions possessing it from the broader class and gives them newfound—and patentable—usefulness.

Here, the purportedly "obvious combination" was not a C(G29A) ligand specifically. It was a G29A modification to *any of the five* natural protein A domains, which JSR's references addressed as a group. *E.g.*, Appx34-37. In other words, the art taught at most a *class or category* of compositions. And the surprising Fab-binding capability of the particular, claimed C(G29A) ligand is not "inherent" in that *class*—it is absent from B(G29A) (*i.e.*, Domain Z). *See infra* p. 47.

The remaining cases cited by JSR also fit neatly within the rule established by precedent and articulated by Cytiva here. In *Persion Pharmaceuticals LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184 (Fed. Cir. 2019), the claims recited methods of treating pain in patients with mild or moderate hepatic impairment by administering an extended-release

formulation of hydrocodone. *Id.* at 1186-87. The obviousness challenge was directed to the use of this particular claimed formulation in this particular claimed patient population, not the obviousness of some broader class of treatment methods. *Id.* at 1187-88. JSR does not dispute this characterization of *Persion*. JB 41-42. *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 946 F.3d 1322 (Fed. Cir. 2020) is similar—the prior art there specifically taught the claimed formulation, not some broader class. *Id.* at 1326-27. In both cases, the patentee's identification and claiming of an inherent feature added nothing to what the POSA would have possessed anyway, and thus little value for the public.

That analysis has no application to claims 4 and 17 of the '765 patent here. JSR argues that, even under Cytiva's articulation of this Court's inherency rules, those claims would have been obvious because "the prior art here taught directly making a particular modification (G29A) to a particular domain (Domain C)." JB 42. But that misapprehends the Board's decisions. The Board was explicit that its obviousness determination was based on the premise that the prior art *generally* taught a G29A modification in SPA-based ligands, including at least the five naturally occurring domains of

protein A—not Domain C in particular. *E.g.*, Appx34-37; *see also supra* Section I.B.

### B. The Board Cannot Rely on Inherency to Avoid Consideration of Objective Indicia of Nonobviousness.

#### 1. *Like all objective indicia of nonobviousness, inherent, unexpected results must be considered.*

This Court has been clear that unexpected results achieved by an invention, even when those results are inherent, can serve as objective indicia of nonobviousness. In *Millennium Pharmaceuticals, Inc. v. Sandoz Inc.*, 862 F.3d 1356 (Fed. Cir. 2017), for example, the Court considered claims directed to a lyophilized (freeze-dried) formulation of bortezomib and mannitol. *Id.* at 1361-62. The inventors had found this formulation exhibited advantageous properties because the lyophilization process formed an ester of bortezomib and mannitol. *Id.* at 1362. While that ester formation and the properties of the ester were the inherent result of lyophilizing bortezomib and mannitol, the Court nonetheless reversed the district court's invalidity determination in part because of that inherent ester's inherent "unexpected results …, including unexpectedly superior stability, solubility, and dissolution." *Id.* at 1368. Nor is *Millennium* some outlier decision—unexpected results are often inherent properties, and both this Court and its

predecessor have urged consideration of such results on many occasions. *See, e.g.*, *Allergan*, 796 F.3d at 1307 ("The unexpected properties of the claimed formulation, even if inherent in that formulation, differ in kind from the prior art, thereby supporting a conclusion of nonobviousness."); *Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed Cir. 2004) (finding that post-filing work performed to establish the unexpected, inherent property of a claimed invention was properly considered in assessing obviousness).

Once again, rather than seek to reconcile such precedents, JSR asks the Court to sweep away those decisions it dislikes and announce yet another new rule—that unexpected results relating to an inherent property of an otherwise obvious composition cannot serve to establish nonobviousness. In advancing this position, JSR turns to two familiar decisions—*Persion* and *Couvaras*—and, once again, overreads them. Neither case aligns with JSR's wishful thinking.

JSR criticizes Cytiva for its contention that *Persion* "nowhere suggested that 'inherency' could be used to ignore or discount the existence of unexpected properties as objective evidence of nonobviousness." JB 53 (quoting Cytiva Br. 63-64). JSR boldly proclaims "that's *exactly* what

*Persion* held in the portion quoted by the Board and ignored by Cytiva." *Id.* (emphasis added). One will search in vain, however, for such a groundbreaking holding in *Persion*, let alone such a holding in the snippet of *Persion* quoted by JSR. As JSR notes, *Persion* did state that "it 'is not the law' that 'a structure suggested by the prior art, and, hence, potentially in the possession of the public, is patentable … because it also possesses an [i]nherent, but hitherto unknown, function which [the patentees] claim to have discovered." 945 F.3d at 1190 (alterations in original) (quoting *In re Wiseman*, 596 F.2d 1019, 1023 (C.C.P.A. 1979)). Absent from that quoted language (and the rest of the decision), however, is any suggestion that *unexpected* results can be ignored simply because they are inherent. Were there any doubt on this point, one need only examine the *Wiseman* case quoted in the *Persion* passage on which JSR relies—that earlier decision never even *mentions* unexpected results. 596 F.2d 1019; *see also Ex parte Joseph P. Balint, Frank R. Jones, &Richard B. Gayle III*, No. 2022-000215, 2022 WL 179096, at *5 (P.T.A.B. Jan. 18, 2022) (explaining that "[t]he *Wiseman* court did not address unexpected results" and reversing examiner's obviousness rejection because "the issue is not whether combining the cited references would produce a vector having the same

structure, and therefore the same properties, as the vector recited in Appellant's claims" but rather "whether a person of ordinary skill in the art would have expected those properties, based on the teachings of the cited references").

JSR next grasps at the statement in *Persion* that "the pharmacokinetic limitations of the asserted claims were inherent and added *no patentable weight* to the pharmacokinetic claims." JB 53 (quoting *Persion*, 945 F.3d at 1191 (emphasis added by JSR)). Even were the same true of the Fab-binding limitations of claims 4 and 17 of the '765 patent—and, for the reasons discussed above, it is not—this argument misses the point. The Board could have ignored entirely those Fab-binding limitations, and the remaining claimed chromatography matrix with a C(G29A) ligand still would exhibit this unexpected property. The express recitation of Fab-binding in claims 4 and 17 and the weight accorded that language is irrelevant. *See, e.g.*, *Knoll Pharm.*, 367 F.3d at 1385.

Nor does *Couvaras* "dispose[] of Cytiva's [unexpected property] contentions," as JSR suggests. JB 54. As described above, the claim there "relate[d] to combatting hypertension with known antihypertensive agents [(a GABA-a agonist and an ARB)] and claiming their previously

unappreciated mechanism of action"—*i.e.*, increasing prostacyclin release. *Couvaras*, 70 F.4th at 1377. The Court found that this claimed mechanism was an inherent feature "that naturally flows from the co-administration."[1] *Id.* at 1380. In the objective indicia of nonobviousness section of *Couvaras*, this Court merely stated that "recitation of a *mechanism of action*, even an unexpected one, does not *necessarily* overcome a prima facie case of obviousness." 70 F.4th at 1380 (emphases added). In the very next sentence, however, it clarified that "[t]o establish unexpected results, [the patentee] would have needed to show that the co-administration of a GABA-a agonist and an ARB provided an *unexpected benefit*, such as, *e.g.*, better control of hypertension, less toxicity to patients, or the ability to use surprisingly low dosages." *Id.* at 1380-81 (emphasis added). This further context—context omitted by JSR—makes clear that *Couvaras* stands only for the proposition that identification of a mechanism of action may not suffice to establish nonobviousness; it says nothing new about the identification of desirable unexpected (and inherent) results.

[1] It expressly did not address the question of reasonable expectation of success, which had not been presented to the Board. *Id.* at 1379.

#### 2. *The Board's failure even to consider the unexpected Fab-binding of the claimed C(G29A) ligands cannot be excused by JSR's arguments regarding the strength of that objective indicium.*

This Court repeatedly has warned that objective indicia of nonobviousness "*must* be considered … before any conclusion regarding obviousness is reached." *Millennium*, 862 F.3d at 1367 (emphasis added); *see also, e.g.*, *Knoll Pharm.*, 367 F.3d at 1385 ("The so-called 'objective' criteria must always be considered … ."). "[I]t is error to reach a conclusion of obviousness" without having performed such an analysis. *WBIP*, 829 F.3d at 1328; *see also, e.g.*, *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012). Yet that is precisely what the Board has done here. As set forth in Cytiva's Opening Brief, the Board entirely failed to discharge this duty, instead conflating the question of whether the claimed ligands exhibited unexpected results with the question of whether the POSA would have had a reasonable expectation of success in achieving the Fab-binding capability recited in claims 4 and 17 of the '765 patent. Cytiva Br. 62 (citing Appx48; Appx224).

JSR does not dispute this fundamental point. It instead urges this Court to disregard the Board's clear legal error because, in JSR's self-serving view, the evidence of unexpected results presented by Cytiva was not

strong enough. Unsurprisingly, JSR identifies no case (and Cytiva is aware of none) in which a factfinder's complete failure to consider a proffered objective indicium of nonobviousness has been excused on such a basis. The Court should not retreat from years of precedent and break new ground here.

In any event, JSR's assessment of Cytiva's position is factually and legally flawed. JSR complains of Cytiva's purported failure to compare a C(G29A) ligand to unmodified Domain C, which JSR now contends is the closest prior art, JB 55, but that ignores the entire point of Cytiva's unexpected-properties case: that C(G29A) unexpectedly *retains* the Fab-binding capacity that Domain C had—not that it somehow differs in that regard from Domain C—even as it reaps the benefits of a G29A mutation that the art taught regarding stability. *See, e.g.*, Appx1418-20; Appx1428-31; Appx2058-60; Appx2065-69; Appx7302-07. And JSR's conclusory assertion that "Cytiva's weak showing of unexpected results does not overcome the strong prima facie case" does not absolve the Board of its failure to perform such a weighing of the evidence.

## STATEMENT OF THE ISSUES ON CROSS-APPEAL

JSR's cross-appeal presents the following issue: whether the Board's findings that JSR had failed to demonstrate the unpatentability of claims 4 and 7 of U.S. Patent No. 10,323,142 ("the '142 patent") and claims 11 and 29 of U.S. Patent No. 10,875,007 ("the '007 patent") were supported by substantial evidence.

## SUMMARY OF ARGUMENT ON CROSS-APPEAL

The Board's decision that the process claims requiring Fab binding had not been shown to be obvious was supported by substantial evidence. As to those claims, the Board correctly found that inherency is unavailable, because JSR failed to show that the POSA would have carried out the claimed process using target compounds that would have exhibited the required binding.

On cross-appeal, JSR argues, first, that binding to the Fab portion of a whole antibody would have been inherent when a whole antibody is purified. This argument fails both because it is new on appeal and is forfeited, and because the record is silent as to whether Fab binding would occur in this situation.

Second, JSR argues that the Board erroneously failed to consider its argument that the POSA would combine ligands comprising the recited C(G29A) sequence with other native-sequence ligands that were known to exhibit Fab binding. Substantial evidence supports rejection of this argument, which not only misreads the claim, but makes no sense because the native-sequence ligands would not possess the stability imparted by the claimed invention, and the POSA would not have combined such ligands with those of the invention.

Finally, JSR erroneously suggests that the Board required a showing of some more-than-minimal amount of Fab binding, and challenges the evidence supporting the Board's finding that there would not have been a reasonable expectation of Fab binding. But the Board's obviousness determination did not impose a particular standard for the amount of Fab binding required, but instead was based on a finding—amply supported by record evidence—that the POSA would not have had an expectation of any such binding.

Accordingly, regardless of the Court's decision in Cytiva's appeal, the Board's non-obviousness rulings on the cross-appealed claims should be affirmed.

## STANDARD OF REVIEW ON CROSS-APPEAL

Cytiva agrees with JSR that this Court reviews the Board's findings of fact for substantial evidence, and its legal conclusions de novo. *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021). The Board's obviousness determinations, though ultimately questions of law, rested on factual determinations that are reviewed for substantial evidence. *Id.* JSR's standard-of-review section incorrectly suggests that the cross-appeal requires reviewing the Board's claim constructions; for reasons explained below, it does not.

## ARGUMENT ON CROSS-APPEAL

### III. The Board's Confirmation of the Cross-Appeal Claims Was Supported by Substantial Evidence and Should Be Affirmed.

The Board confirmed the patentability of claims 4 and 7 of the '142 patent and claims 11 and 29 of the '007 patent—the "cross-appeal claims." Appx101-05; Appx111-15; Appx162-66; Appx169-72. It was right to do so, regardless of any decision on the other claims it ruled obvious.

The cross-appeal claims recite "processes for isolating" compounds such as antibodies, using a ligand of invention, "wherein the ligand binds to the Fab part of an antibody." Appx391-92; Appx404-05. As the Board correctly observed, these claims cannot be rendered obvious simply by

pointing to what the ligand is "*capable* of binding," as recited in composition-of-matter claims 4 and 17 of the '765 patent—an "inherent feature" of a "structure claimed," according to the Board. Appx104 n.12; Appx378-79 (emphasis added). Rather, these are process claims. To prevail, JSR needed to prove that the POSA would have had reason to carry out the claimed process in which the ligand *actually binds* to "the Fab part of an antibody," and the POSA would have needed a reasonable expectation of success in doing that. Appx102; Appx104 n.12; *see Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1271 (Fed. Cir. 2018).

The Board correctly recognized that the art did not provide a reasonable expectation that the C(G29A) ligands recited in the claims would bind Fab. Appx102. The analogous G29A mutation made to Domain B led to prior-art Domain Z—the subject of the art JSR relies on for each of its obviousness grounds. While this art taught that the B(G29A) mutation "does not interfere with IgG binding," *i.e.*, binding to the Fc region, JSR's art was "silent with respect to domain Z's ability to bind Fab fragments." Appx102. However, other references, notably the Jansson paper, reported that "the G29A mutation results in a loss of Fab binding ability." Appx103 (citing Appx7368-77); *see* Appx7268; Appx7303-06; Appx5920; Appx5961; Appx6233;

Appx7579. Cytiva's expert Dr. Bracewell thus testified that as to the C(G29A) ligand, any Fab binding would have been at best "unpredictable," and if the POSA had any expectation at all, "the POSA would expect C(G29A) to *lose* Fab binding." Appx7314-15.

Given this body of evidence, the Board was on solid ground when it found that "the Fab binding capacity" of the recited ligands "was unknown"; that "a G29A mutation in domain B results in a domain Z matrix composition that *does not* bind Fab"; that maintaining the natural Fab-binding ability of Domain C in the presence of a G29A mutation was "unexpected[]"; and that JSR "has not established by a preponderance of evidence that the process of isolating Fab target[s] using a mutated SPA domain C ligand would have been obvious" based on the cited art. Appx104-05; Appx108. At minimum, JSR failed to prove a reasonable expectation of success in practicing the cross-appeal claims.

JSR's cross-appeal is an attempt to overcome its failure of proof. First, JSR claims that the Board erred by focusing on a reasonable expectation of binding to Fab fragments, rather than asking whether there was some inherent binding to the Fab part of whole antibodies. JB 59-67. Second, it faults the Board for not expressly addressing an argument, made in passing

in its Petitions, that the POSA would have combined mutated and non-mutated ligands in a single chromatography matrix so as to achieve Fab binding. JB 67-69. And third, JSR posits that the Board's finding on "reasonable expectation" implicitly imposed some threshold amount of binding, and the POSA would have expected some miniscule amount. JB 69-76. None of these arguments has merit.

### A. The Board's Decision Did Not Depend on Misconstruing "Binds to the Fab Part of an Antibody."

#### 1. *The Board Properly Rejected JSR's Obviousness Arguments.*

JSR's first argument on cross-appeal is an attempt to transmogrify its failure of proof into a claim construction argument. JB 59-67. According to JSR, the Board erred by limiting the "target compound(s)" of the cross-appeal claims to "Fab fragments." JB 59-60. This argument fails at the threshold because neither the Board nor Cytiva ever actually construed the claims this way. The argument also fails because it constitutes a brand-new argument on appeal unsupported by the record.

The claim construction JSR advances is in fact undisputed. The parties agree that when the cross-appeal claims recite "bind[ing] to the Fab part of an antibody," this encompasses both binding to a Fab fragment without the

rest of the antibody being present, or binding to the Fab region of a whole antibody. JSR concedes (at 60) that "neither party advocated" a construction limiting this phrase to binding to Fab fragments. And the Board did not adopt one. Not only did the Board not expressly construe "Fab part of an antibody," but JSR quotes the Board's correct statement of what the claims require: "that a mutated SPA ligand binds Fab." JB 60 (quoting Appx102).

JSR nevertheless infers (at 60) that the Board limited the claims to binding Fab fragments because it referred to "Petitioner need[ing] to establish that a mutated SPA domain would reasonably bind a Fab fragment." JB 60 (quoting Appx102). JSR then attacks that straw man construction. JB 60-62.

What JSR overlooks is that the Board was simply rejecting the obviousness case that JSR set out to prove. JSR, not the Board or Cytiva, framed the relevant inquiry in terms of binding Fab fragments. In its Petitions, JSR argued that the "C(G29A)-based SPA ligand" recited in the claims "necessarily is at least capable of binding to the Fab part of an antibody" because, it said, "the specification states that the chromatography ligand of the present invention is *capable of binding Fab fragments of antibodies*." Appx587 (cleaned up) (emphasis added); *see* Appx660-61;

Appx750-51; Appx819. If inherent Fab-binding ability did not carry the day, JSR argued in the alternative that Linhult expressly disclosed "*affinity for…*certain *Fab-fragments* of [antibodies]." Appx588 (emphasis and brackets in original) (citing Appx3815); *see* Appx661; Appx751; Appx820. JSR's expert, likewise, focused on binding to Fab fragments. Mirroring the arguments in the Petitions, he quoted the same discussion of "affinity for … Fab-fragments" in Linhult. Appx3166-67; Appx3340. He also opined that Fab binding would have been "a desirable characteristic" of chromatography ligands because "Fab fragments are of great interest in tumor therapy." Appx3166 (citation omitted); Appx3340.

As the record developed, JSR's focus on Fab fragments did not change. In reply, JSR reiterated its argument that the recited ligands inherently possessed "substantial Fab-binding ability" based on the patents' statement that they are "capable of binding Fab fragments of antibodies." Appx1800 (quoting Appx380). JSR also cited the patents' testing of Fab binding, Appx1800-01—which used "Fab/Kappa, IgG *fragment[s]*," Appx390 (emphasis added). JSR also debated the implications of the Fab-binding data in the Jansson and Ljungberg references. Appx1804-05; Appx7368-77; Appx7474-80. These references, too, discussed testing of Fab *fragments*.

Appx7373 (discussing "relative binding strengths" to "polyclonal $F(ab')_2$ and scFv immunoglobulin fragments"); Appx7474 (discussing "binding properties to isolated $F(ab')_2$ fragments").

In short, neither JSR nor its expert distinguished between binding to Fab fragments and binding to the Fab portion of a whole antibody. Nor did JSR or its expert address whether, if the claimed process were used to purify a whole antibody, any Fab binding would take place. Rather, at every turn, JSR attempted to establish the obviousness of the cross-appeal claims either by reference to the inherent ability of C(G29A) ligands to bind Fab fragments, or by supposed prior art disclosures of binding to Fab fragments.

It is thus little wonder that the Board, in its final written decisions, said that JSR needed "to establish that a mutated SPA domain would reasonably bind a Fab fragment." That is how JSR tried (and failed) to prove obviousness, and nothing in JSR's arguments gave the Board reason to articulate the issue differently. Nor does the Board's wording suggest that it applied an incorrect construction. Rather, as discussed, the Board's conclusion that the claimed *process* of "isolating one or more target compound(s) … wherein the ligand binds to the Fab part of an antibody" was

not inherent in the putative obviousness of the *ligand* was supported by substantial evidence.

Given these arguments, the Board did not err in focusing on whether the POSA would have had reason to attempt to purify Fab fragments using the claimed processes. Appx102-05. Rather, having properly concluded that the POSA would not have expected the recited ligand to bind to the Fab part of an antibody, the Board appropriately found that the POSA would have had no reason to use a C(G29A) ligand to purify Fab fragments. *Id.* It further correctly noted (and JSR does not contest) that Fab *fragments* (again, the focus of JSR's obviousness case) would not have been present when the claimed processes of the independent claims were used to purify whole antibodies, as Fab fragments are a "digestion product of a whole IgG molecule" that are "not naturally found in IgG samples." Appx104 n.12.

#### 2. *JSR's New Argument that Fab Binding Inherently Would Occur During Whole-Antibody Purification Is Unsupported by the Record.*

On appeal, JSR now argues (at 63) that even assuming it would have been non-obvious to use the claimed process to isolate Fab *fragments*, the claimed process inherently is practiced when purifying whole antibodies using a C(G29A) ligand, which, according to the Board, would have been

obvious to try. JSR points out that whole antibodies have Fab regions. JB 63-64 (citing Appx5802). JSR then reasons that because the capability of binding to Fab is an inherent (albeit hitherto unknown and surprising) property of a C(G29A) ligand, the ligand would bind to Fab regions when whole antibodies are purified. JSR argues that this would inherently meet the limitations of the cross-appeal claims even if the POSA would not have expected the binding to occur.

a. At the outset, this argument is forfeited because JSR never made it to the Board. "[A] position not presented in the tribunal under review will not be considered on appeal in the absence of exceptional circumstances." *In re Google Tech. Holdings, LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020). Moreover, both statute and precedent are clear that *only* grounds raised in a Petition, which this argument was not, may be the basis for unpatentability rulings at the PTAB. 35 U.S.C. § 311(a); *Koninklijke Philips NV v. Google LLC*, 948 F.3d 1330, 1335 (Fed. Cir. 2020).

JSR argued in its Petition that "the recited C(G29A)-based SPA ligand necessarily is capable of binding to the Fab part of an antibody," but the entirety of its one-paragraph argument is focused on Fab-binding capabilities in the abstract. Appx587-88. And as discussed, the evidence JSR

brought to bear on this point all relates to Fab fragments. *Id.*; *supra* pp. 50-51. JSR never raised the question of whether a *whole* antibody, which is concededly capable of binding to a C(G29A) ligand at the Fc region (*see* Appx95 n.8), would *also* in practice bind to the ligand via its Fab portion. And, unsurprisingly, neither Cytiva nor the Board engaged with this issue.

Because the supposed inherent obviousness of Fab binding during whole-antibody purifications was not raised below, this Court should not rule on it now.

b. JSR anyway failed to develop the evidence it would have needed to advance this new argument. In particular, JSR's argument takes the evidence of record indicating that the ligands can bind to Fab fragments, and simply assumes that a whole antibody will exhibit Fab binding just as a Fab fragment would. JB 64. But no expert witness addressed this question, and JSR did not even attempt to present any evidence on it. It cites *nothing* for the critical conclusion that "a POSA performing the isolation of IgG with the obvious C(G29A) ligand would naturally satisfy the claimed 'binds to the Fab part of an antibody' limitation, by binding to the Fab part of the whole antibody." JB 64. "Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated

expert testimony." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1069 (Fed. Cir. 2005).

Unlike a Fab fragment, a whole antibody has an Fc region, and is undisputedly capable of binding to the claimed ligands via that Fc region. Appx95 n.8; Appx587. In fact, Domain Z's retained Fc binding plus improved alkaline stability explains why Domain Z—a Domain B-derived ligand with a G29A mutation—is useful as a commercial product for purifying whole antibodies, and also was the starting point for so much work in the field. Appx7289-90; Appx7373 (strong Fc binding shown for the five natural domains and Domain Z).

To prove inherency, JSR had to show that Fab binding would "necessarily" occur—that when whole antibodies are passed through a column with C(G29A) ligands, the ligands *in fact* "bind[] to the Fab part of an antibody." *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991); Appx391. It is not enough that the Court or counsel might deem it plausible or even probable that the antibodies would bind to the ligand at their "Fab part." "Inherency … may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient." *Continental Can*, 948

F.2d at 1269 (quoting *In re Oerlich*, 666 F.2d 578, 581 (C.C.P.A. 1981)). If JSR had properly developed this inherency argument below, it would presumably have put forward evidence—such as expert testimony—that binding necessarily occurs to whole antibodies as well as to Fab fragments. But because it did not do so, the record is silent on inherency. Neither side's expert, nor either party, nor the Board addressed whether, with a whole antibody, such Fab binding would in fact occur (let alone "necessarily" do so).

Accordingly, the record does not support a finding that isolating whole antibodies inherently practices the cross-appeal claims, even if JSR were permitted to raise such a theory. JSR cannot secure a reversal or vacatur on the basis of inherency arguments it wishes it had made or evidence it wishes it had adduced.[2]

### B. JSR's "Combination Ligand" Argument Does Not Provide a Basis for Vacatur or Reversal.

JSR's next argument on cross-appeal centers around an argument that it made in a single paragraph of its Petitions: that because the cross-appeal

[2] For the same reason, JSR's discussion of case law about "new use" (at 65-66) does not affect the analysis. Assuming *arguendo* that C(G29A) ligands would have been understood as "old" compositions for purifying whole antibodies, the cross-appeal claims are not directed to a new use—they are directed to that same use. JSR failed to establish that the cross-appeal claims are practiced as a part of this use.

claims are "comprising" claims that "permit the incorporation of additional amino acid sequences," the POSA would create a chromatography matrix containing (1) at least two polypeptides of the claimed invention having a C(G29A) sequence, as the claims require, and also (2) a natural, unmodified Protein A domain. JB 67-69; Appx820-21. JSR claims that because Cytiva overlooked this argument in its Patent Owner Response, and because the Board did not address it head-on in the Final Written Decisions, there is "only one possible evidence-supported finding" and JSR therefore wins by default. JB 67 (quoting *Corning v. Fast Felt Corp.*, 873 F.3d 896, 901 (Fed. Cir. 2017)). JSR is wrong both substantively and procedurally.

1. To begin with, JSR's suggestion (at 68) that Cytiva's opposition to this argument consists solely of "attorney argument coupled with out-of-context passages from Hober and Dr. Cramer's deposition testimony" is false. On the contrary, Cytiva's expert, Dr. Bracewell, explained—contemporaneously with the Patent Owner Response—why the argument is meritless. Appx7319-20.

First, as Dr. Bracewell explained, JSR's argument misconstrues the claims. While the claims are "comprising" claims in which "the chromatography matrix" may comprise additional unclaimed elements, the

claims also recite that "each polypeptide" in "the ligand" must contain the recited C(G29A) sequence.[3] Appx391; Appx7319-20. The cross-appeal claims require that "*the ligand* binds to the Fab part of an antibody"—not just that something else in the matrix do so—meaning that the cross-appeal claims are not satisfied if JSR's hypothetical matrix, "comprising" a C(G29A)-based "ligand" plus a natural domain, binds to Fab.

Second, even assuming the claims could encompass binding to the multimer JSR posits, the POSA would have had no reason to make such a Frankenstein's monster. It makes no sense to take a C(G29A) polypeptide—which, according to the Board's findings, would be expected to have poor Fab binding but improved stability—and try to give it Fab binding by attaching a native polypeptide having better Fab binding but poorer stability. Appx7320. As Dr. Bracewell explained, "that would not fulfill the goal … of preserving the Fab binding following exposure to alkali conditions." *Id.*

JSR has no response to this. The best it can do is to point out that Hober discloses hybrid ligands containing both mutated and native

[3] It is undisputed that "SEQ. ID NO. 1" here is the sequence for natural Domain C, so the recited "modified SEQ. ID NO. 1" is Domain C with a G29A mutation—*i.e.*, C(G29A).

sequences. JB 67-68. But neither Hober nor any other reference contains a response to Dr. Bracewell's criticism, which is unsurprising as none addressed how to achieve Fab binding while maintaining improved alkali stability. Appx102-03 ("[E]ach of Linhult, Abrahmsén, or Hober is silent with respect to Fab binding to a mutated SPA domain."); Appx286 ("Berg … does not address Fab binding in the context of a mutant SPA domain ligand … ."). Hober itself expressed a preference for a "best embodiment" consisting of "a tetramer of protein Z comprising the mutation N23T"—*i.e.*, four identical polypeptides having a B(G29A, N23T) sequence. Appx3851. And JSR's expert agreed both that Hober did not experiment with multimers having different native and non-native sequences, and that the POSA would have preferred ligands having stability-enhancing mutations in all their monomers. *See* Appx7628. JSR's "combination ligand" therefore would not have rendered the cross-appeal claims obvious.

2. Ducking the merits, JSR focuses on supposed procedural fouls by Cytiva and the Board, but these are not grounds for reversal either.

At the outset, JSR's criticism of Cytiva for failing to address "the combination ligand taught by Hober" in its Patent Owner Response (at 67) is misplaced for the basic reason that Hober was not even in the ground where

JSR raised the argument, Appx783-84, nor was Hober mentioned in the paragraph of argument (at Appx820-21) that JSR now showcases. *See also* Appx5779 (JSR demonstrative of the argument, citing only its Reply, not its Petition). JSR also stops short of saying Cytiva waived anything, for good reason. Cytiva unquestionably addressed the argument squarely in sur-reply and at oral argument, after JSR articulated it more clearly, and the Board never intimated that Cytiva was somehow precluded from doing so. Appx2006-07, Appx2254. JSR does not argue that the Board erred by allowing Cytiva to respond when and how it did, let alone cite any authority for the proposition that this Court can find that a response presented in sur-reply below is waived when the Board did not do so. Rather, JSR's real criticism of Cytiva seems to be that there is insufficient evidence on Cytiva's side. But as discussed, this is simply wrong—Dr. Bracewell opined about the issue explicitly. Appx7319-20.

JSR also faults the Board for not spelling out its rejection of the argument. This, JSR contends (at 67, 69), is grounds for reversal or at least vacatur even without reaching the merits. This argument, too, is wrong. "[T]here is no requirement that the Board expressly discuss each and every negative and positive piece of evidence lurking in the record to evaluate a

cursory argument." *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017); *see Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1322 (Fed. Cir. 2016) (observing that the Board is "not require[d] … to address every argument raised by a party or explain every possible reason supporting its conclusion"). Here, it defies credulity to suppose that the Board did not consider the issue; not only was the issue squarely presented in the briefs, but both Cytiva and JSR discussed it at length at oral argument, and Judge Snedden asked a question succinctly capturing one reason the argument failed. Appx2219-20; Appx2254; Appx2273-74; Appx5779. Under the circumstances—particularly given the cursory treatment of the argument in the Petitions, without any reference to the now-central Hober reference—the logical inference is that the Board did not consider the argument worthy of mention, not that it overlooked a potentially invalidating issue. Substantial evidence supports the proposition that the POSA would not have made a "combination ligand taught by Hober," and in fact the record cannot support the opposite conclusion.

### C. The Board's Decision on Reasonable Expectation Was Supported by Substantial Evidence.

JSR's final argument on cross-appeal is a frontal assault on the Board's factual findings. Starting with the premise that only a "minimal level" of Fab

binding would have been necessary—and claiming incorrectly that the Board implicitly required more—JSR revisits the prior art on Fab binding in Domain Z, so as to conclude that "significant record evidence would have given the POSA a reasonable expectation of success in achieving such binding with C(G29A) specifically." JB 70. JSR's argument misconstrues the Board's decision, overlooks the substantial evidence that the POSA would have had a reasonable expectation that the G29A mutation would *entirely eliminate* Fab binding, and turns substantial-evidence review on its head.

Initially, while JSR is correct (at 70-71) that the Board never resolved the question of whether more than some miniscule level of Fab binding would be required in order to meet the limitations of the cross-appeal claims, JSR also acknowledges that it had no need to do so. JSR concedes that the Board found that the prior art taught "the loss of Fab binding," "thus making irrelevant the question over whether a POSA would have needed to expect minimal or significant binding." JB 71 (citing Appx103-04). The Board *also* found that "Fab binding to mutated SPA domains is unpredictable," meaning that the POSA simply would not have had a reasonable expectation of *any* binding. Appx103.

The record is replete with support for these factual findings. Contrary to JSR's factual arguments on appeal (at 73), the Board had an ample evidentiary basis to reject JSR's reading of Figure 3 of Jansson to imply non-zero Fab binding. Jansson itself states—referring to *both* its analysis of binding to "$F(ab')_2$ and to the scFv"—that "domain Z shows only little or no binding activity." Appx7375.

And while (at 73 n.13) JSR accuses Cytiva of "obscur[ing]" the supposed Fab binding in panel C "through attorney argument," and parses Jansson's words to suggest that it must have showed "weak," not "zero," binding, JSR overlooks that Cytiva presented expert testimony on this exact point. Dr. Bracewell testified that the POSA would have interpreted the art to show "complete removal of any Fab-binding activity," "which would have extinguished any reasonable expectation of such activity" in a C(G29A) ligand. Appx7317. Dr. Bracewell also presented a credible explanation of how to square the art's interpretation of G29A mutations as *eliminating* Fab binding with the bar charts in Jansson that appear to depict some value above zero: "the reference to 'little or no'—without saying which—would have indicated to the POSA that the measured activity was below the limits

of reliable detection, meaning that the POSA would not have had an expectation that any such binding was present." Appx7316.

If any more were needed—and it is not—later references in the field also counter JSR's reading of Jansson. One reference described Jansson as showing that Domain Z "lacks the ability to bind Fab." Appx5961. Another—the Graille reference JSR touts (at 74-75)—stated that "domain Z is devoid of [Fab-binding] activity," citing Jansson. Appx6233. Nothing in Jansson obligated the Board to conclude, as JSR urges, that some small amount of Fab binding was actually observed in panel C of Figure 3. Both Jansson's authors and later scientists in the field interpreted Jansson's data to show *the opposite*.[4] The Board was entitled to credit this evidence.

Nor does the Ljungberg reference help JSR or warrant reversal. JSR makes much (at 75) of one data point in which Ljungberg suggested that a pentamer of five domain Z polypeptides would exhibit "significant" Fab

[4] Graille, moreover, predicted that an alanine at position 29—*i.e.*, a G29A mutation—would "perturb the interaction" between the ligand and the Fab portion of an antibody. Appx6233; Appx7306. This further supports the Board's findings. JSR's analysis of how Graille might indicate that Domain C—*without* a G29A mutation—shows increased affinity for Fab thus does nothing to upset the Board's findings, even if that analysis were supported by something more than a citation to JSR's reply brief (at 75, citing Appx1805).

binding. But Cytiva's expert Dr. Bracewell addressed this too. Appx5440-41. As Dr. Bracewell explained, Ljungberg itself characterized this binding as "low," and stated that native domains have "a structural motif which is not present in Z, which is necessary for Fab-binding." Appx5441; Appx7479. Dr. Bracewell thus explained why Ljungberg would not alter his opinion that the POSA would not have a reasonable expectation of success. Appx5441.

This too constitutes substantial evidence, but in any event, the fine parsing of data on Domain Z loses the forest for the trees. Independently of this, the record also supported the Board's finding that Fab binding would be unpredictable—which on its own is enough to support a conclusion that there would not have been a reasonable expectation of Fab binding to a C(G29A) ligand. Dr. Bracewell testified:

> And even if (counterfactually) the POSA believed that there was some small degree of binding in Domain B with a G29A mutation, any such weak binding activity would not have given the POSA an expectation that Domain C with a G29A mutation—a different protein, with a homologous mutation—would be 'capable of binding to the Fab part of an antibody' as the claims require.

Appx7316-17. This closely tracks the Board's finding that "Fab binding capacity was unknown"—and thus that the ability to bind Fab would not have been reasonably expected nor obvious. Appx104-05.

Putting everything together, the record presents far more than enough "relevant evidence as a reasonable mind might accept as adequate to support" the Board's conclusion that the POSA would not have expected the claimed ligands to exhibit *any* Fab binding. *In re NuVasive, Inc.*, 842 F.3d 1376, 1379-80 (Fed. Cir. 2016). At best for JSR, its scientific arguments might be able to support the opposite conclusion as well, but "[i]f two inconsistent conclusions may reasonably be drawn from the evidence in record, the PTAB's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1356 (Fed. Cir. 2018) (cleaned up). The Board's decision on the cross-appeal claims should be affirmed.

## CONCLUSION

For the reasons above, this Court should reverse the Board's obviousness determinations as to claims 1-7, 10-20, and 23-26 of the '765 patent; claims 1-3, 5-7, 10-16, 18-20, and 23-30 of the '142 patent; and claims 1-10, 12-14, 16-28, 30-32, and 34-37 of the '007 patent. This Court should

affirm the Board's non-obviousness determinations as to claims 4 and 17 of the '142 patent and claims 11 and 29 of the '007 patent.

Respectfully submitted,

/s/ David M. Krinsky
DAVID M. KRINSKY
ANDREW L. HOFFMAN
WILLIAMS & CONNOLLY LLP
*680 Maine Ave., S.W.*
*Washington, DC 20024*
*(202) 434-5000*

MARCH 6, 2024

## CERTIFICATE OF SERVICE

I, David M. Krinsky, counsel for appellant and a member of the Bar of this Court, certify that, on March 6, 2024, a copy of the attached Response and Reply Brief of Appellant Cytiva Bioprocess R&D AB was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

MARCH 6, 2024

/s/ David M. Krinsky
DAVID M. KRINSKY

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE LIMITATION AND WORD COUNT

I, David M. Krinsky, counsel for appellant and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b), that the attached Response and Reply Brief of Appellant Cytiva Bioprocess R&D AB is proportionately spaced, has a typeface of 14 points or more, and contains 13,975 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

MARCH 6, 2024

/s/ David M. Krinsky
DAVID M. KRINSKY